all distinguishable from the case at bar, and therefore inapplicable as precedents.

As the trial justice erred in dismissing the complaint, the judgment based thereon should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.

(170 App. Div. 78)

### SMITH et al. v. JAMISON et al.

(Supreme Court, Appellate Division, First Department. June 25, 1915.)

1. PARTNERSHIP ☞236—FIRM CONTRACT—SUFFICIENCY OF EVIDENCE.

In an action for breach of agreement in dissolution of a partnership, evidence *held* sufficient to show that a contract giving three employés an interest in the profits of a branch of the business was a firm contract, and not the personal contract of a partner.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 484–486; Dec. Dig. ☞236.]

• 2. PARTNERSHIP ☞79 —PARTNER'S ACT—RATIFICATION BY FIRM.

Partners, who knew that another partner had opened a special account with a bank to pay the salaries of firm employés, and who acquiesced in its sole management and control by such partner without objection, ratified the payment of salaries through such account, so that they were properly chargeable on a firm accounting with the amounts checked out therefrom to pay employés.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 127; Dec. Dig. ☞79.]

3. PARTNERSHIP ☞236—DISSOLUTION AGREEMENT—EFFECT.

A dissolution agreement between partners provided that certain firm properties should be disposed of and the net proceeds distributed, that all securities should be distributed in kind, that remaining assets should be taken over by two partners, as of a fixed date, at the inventoried value on such date, such partners agreeing to assume and discharge all liabilities of the firm and to assume all its contracts, and that the continuing partners should pay to a retiring partner the value of his share in the firm property, plus a fixed sum in cash for his interest in the business, trademarks, and good will of the firm, etc., and also fixed the values to the retiring partners of intangibles, appreciated values, and the last six months' business of the old firm. *Held*, that such dissolution agreement did not operate to discharge a retiring partner from accountability to the continuing partners for his proportionate share of the interest of branch house employés in firm profits, as it did not show that it was the intention of the parties to vary the ordinary method of distribution, entitling a retiring partner only to his net interest in the business as of the date of withdrawal.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 484–486; Dec. Dig. ☞236.]

4. PARTNERSHIP ☞236—DISSOLUTION—MISTAKE IN ACCOUNTING.

Where the agreement dissolving a partnership did not fix a retiring partner's interest in the business with reference to the figures on the books, for the ascertainment of which it provided, if they were inaccurate, the omission to charge such retiring partner with his share of the interest of branch house employés in firm profits, a firm liability, did not relieve such retiring partner from accountability to the continuing partners for his share of such liability.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 484–486; Dec. Dig. ☞236.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. ESTOPPEL ☞87—ACTION IN RELIANCE—NECESSITY.

   No estoppel against partners continuing a firm could be based upon failure to charge a retiring partner on the books with his proportionate share of a firm liability, upon which omission the retiring partner did not act and by which he was not prejudiced.

   [Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 230–234; Dec. Dig. ☞87.]

Appeal from Judgment on Report of Referee.

Action by Roxy M. Smith and others, as executors, against William A. Jamison and others, as administrators. From a judgment for defendants, entered upon the report of referee, plaintiffs appeal. Judgment directed dismissing the complaint upon the merits.

See, also, 154 N. Y. Supp. 1145.

The following is the opinion of O'Brien, Referee:

This action was originally brought by William V. R. Smith against William A. Jamison and John Arbuckle, to recover damages for the alleged breach of an agreement in dissolution of partnership. Since the beginning of the action Smith and Arkuckle have died and their representatives have been substituted as parties in their stead. The agreement of dissolution bears date of April 4, 1906, and is between John Arbuckle and William A. Jamison, of the first part, and James N. Jarvie and William V. R. Smith, of the second part. These persons had been associated in partnership since March 28, 1891, under articles of copartnership dated on that date, and supplementary articles dated January 1, 1896. The issue raised by the pleadings is, in brief, whether a certain amount of $24,320.44 could or could not properly be charged against Smith by the remaining partners in liquidating his share of the business under the dissolution. It is conceded that, if properly chargeable, this sum represented Smith's proportionate amount of additional salaries paid by way of a bonus or percentage of profits to three employés named Flood, Kerr, and Edsall, who were managers of the Pittsburg branch of the firm's business. The amount did not appear in any of the first three semiannual statements rendered to Smith pursuant to the dissolution agreement, but appeared in the fourth and final statement of January 2, 1908, as follows: "To adjustment of amount due Flood, Kerr & Edsall to Jan. 1, 1906, plus interest to date, $24,-320.44."

It is not contended that the salaries which were paid to these three managers in Pittsburg were not properly paid under contracts existing with them, nor that so far as they were concerned they had not earned the money. The plaintiffs' contentions in respect of these payments are two. They contend, first, that any contract giving Flood, Kerr, and Edsall an interest in the profits of the Pittsburg business was the personal contract of John Arbuckle, and not of the firm of Arbuckle Bros.; and, secondly, that even if this first contention is to be determined against them, the amount of such interest in the Pittsburg profits could not be charged proportionately against the retiring partners, because of the provisions of the dissolution agreement. These contentions will be discussed in the order named.

The facts with respect to the employment of Flood, Kerr, and Edsall are briefly as follows:

The Pittsburg house was the parent house of the Arbuckle business; the partners having moved to New York about 1882 and set up their business in New York City after the Pittsburg business had become well established. The Pittsburg business was a grocery business, which had been conducted as a partnership under the name of "Arbuckles & Co." In 1888 the firm doing business in Pittsburg was composed of Charles Arbuckle, John Arbuckle, and William V. R. Smith, and there was a firm in New York, which was the predecessor of the firm formed under the articles of copartnership of 1891, composed of the same persons and called "Arbuckle Bros." The Pittsburg

house was managed by the three employés, Flood, Kerr, and Edsall. It was the practice of the Arbuckle firms not to let their employés know what other employés were receiving as salaries, and, although prior to November, 1888, the salaries of the Pittsburg managers were in reality $4,000, $2,500, and $1,500, respectively, only a part of these salaries had been paid directly through the Pittsburg house, namely, to Flood $1,500, to Kerr $1,250, and to Edsall $1,000; the remaining amounts having been paid from the New York house by checks signed "Chas. and John Arbuckle" and drawn on an account in the Importers' & Traders' National Bank. This account was particularly under the supervision of Mr. John Arbuckle, who not only at that time, but later, had the salaries of the various concerns in his especial charge.

In November, 1888, Mr. Arbuckle made a new arrangement with Flood, Kerr, and Edsall by which their salaries were substantially raised, but instead of being fixed were to be contingent in amount upon the future profits of the business; that is to say, Flood's salary was increased from $4,000 to $6,000, Kerr's from $2,500 to $3,750, and Edsall's from $1,500 to $3,000, and then, in case of each, the new amount was divided by the average of the profits of the preceding nine years of the Pittsburg business, the quotient representing the percentage of the future profits to be paid to the employé in lieu of salary, so that he should have an incentive to increase those profits. The net result was that Flood's percentage became 7.7 per cent., Kerr's 4.814 per cent., and Edsall's 3.85 per cent., making an aggregate of 16.364 per cent. of profits for managing the house. In addition to this arrangement Mr. Arbuckle agreed to pay to each 8 per cent. interest upon the yearly balance of his salary if he would keep it on deposit with the firm. After this date of November, 1888, Flood, Kerr, and Edsall continued to draw ostensibly the same amounts that they had always drawn from the Pittsburg house, and the additional amount of their salaries, based upon the percentages accorded them, was made up from statements submitted by them, and was paid as before by New York checks signed "Chas. and John Arbuckle." The agreement in the first place as to each employé was merely oral, but was subsequently reduced to writing in a more or less formal way by each of them and confirmed by Mr. Arbuckle. The tenor of these writings, taken with the testimony of Flood, Kerr, and Edsall, leaves little doubt in my mind that whatever the alleged secret nature of the arrangement, which will be later referred to, Mr. John Arbuckle regarded himself as making these contracts, not for himself individually, but on behalf of the partnership.

In March, 1891, the new firm was formed in New York. Mr. Charles Arbuckle had died, and the partners became John Arbuckle, William V. R. Smith, James N. Jarvie, and William A. Jamison. The capital of the firm was fixed at $7,000,000, of which Mr. Arbuckle contributed 64 per cent., Mr. Smith 12½ per cent., Mr. Jarvie 16½ per cent., and Mr. Jamison 7 per cent.; each partner taking a like percentage of the profits and losses. The new firm took over the various other firms bearing the Arbuckle name, as going concerns, and expressly assumed all their contracts. The Pittsburg business was to be continued, as before, under the name of "Arbuckles & Co.," and the New York business under the name of "Arbuckle Bros." For the purposes of this case the two firms may be regarded as one.

After this time the additional compensation of Flood, Kerr, and Edsall was paid by checks signed by Mr. John Arbuckle for Arbuckle Bros., out of an account known as "Arbuckles & Co., Special," in the Importers' & Traders' National Bank in New York. This account was opened by Mr. Jarvie by the deposit of two checks of $1,000 each, drawn by Arbuckle Bros.; but it was not shown who signed these checks, as they have long since been destroyed. The account was under the special control of John Arbuckle. There is little direct evidence to show what personal knowledge the other partners had of the account up to the year 1905, when the bank adopted a card index system of signatures, and asked for the signature of those persons authorized to draw on the account, upon which the card was signed by all four partners, "Arbuckles & Co., Special," followed by their individual names.

During the continuance of the partnership and up to the year 1906 over $223,000 was deposited in this account by checks of Arbuckle Bros., of which.

all but $110 was paid out by John Arbuckle in salaries to various New York and Pittsburg employés. It is claimed by the plaintiffs that, as to Flood, Kerr, and Edsall, this was a secret arrangement of Mr. Arbuckle, and was not binding upon the firm. No good reason has been suggested, however, why Mr. Arbuckle should have made the contracts with the idea of paying out this large sum of money from his share of the profits, in order to interest the Pittsburg managers in increasing the profits of the other partners, who under this theory were not in any way to contribute to the amounts paid to the men who were responsible for the profits of the Pittsburg business. It is not, on the other hand, surprising that the sole management of the account should have been left to Mr. Arbuckle, when it is remembered that not only was the subject of salaries in his special care, but he was at all times the partner most largely interested in the business; his share thereof from 1891 to 1896 having been 64 per cent., and thereafter about 49 per cent.

I think it also difficult to conceive why, if this were to be regarded as a personal liability of Mr. John Arbuckle, instead of a liability of the firm, these large amounts should have been taken from the general account of Arbuckle Bros. without the other partners having known of it. It was shown by the testimony of Mr. Jamison that he had himself forwarded to Pittsburg and to Brooklyn checks belonging to various employés, and that he knew that there were other employés besides those to whom he forwarded checks who were paid by a similar arrangement. Mr. Jamison did not recollect ever having seen a check drawn on the special account to Flood, Kerr, or Edsall, although he had seen statements rendered by these persons as to their salaries. That the general arrangement as to special payment of extra salaries was well known to the members of the firm is shown by Mr. Jamison's testimony that the matter was generally discussed among the partners. The check book of the special account was supplemented by an account in the books of Arbuckle Bros. under the name of "Arbuckles & Co., Special," which showed the gross payments into the special account and the gross amounts withdrawn from it. In 1899 the witness Blackburn, auditor of Arbuckle Bros., went to Pittsburg to audit the books there, and on his return expressed to Mr. Smith surprise at the meager salaries paid to Flood, Kerr, and Edsall, to which Smith's reply was that these employés were cared for by Mr. Arbuckle. This testimony, standing alone, would not have solved the question as to whether the extra compensation should be charged to the firm or to John Arbuckle personally. It is, however, persuasive on the point that Mr. Smith knew as early as 1899 that extra compensation was being paid to these men working for the firm in Pittsburg.

[1, 2] On the whole, I cannot avoid the conclusion that the attitude assumed by the other partners in connection with the Arbuckles & Co. special account is only consistent with the view that with knowledge of the existence and purpose of the account, and not objecting, they must be held to have ratified even though they did not originally expressly authorize it. They acquiesced in its sole management and control by Mr. John Arbuckle. These conclusions are enforced by the fact that there was paid into the account by Arbuckle Bros. during the period of the partnership sums aggregating $223,000 which were considered each year as payments made by the firm, thus diminishing the amount of funds that were divisible among the partners. It seems to me inconceivable that the partners should have permitted during that entire period a charge of this large sum consisting of annual payments, if there was not some knowledge of the account and the objects for which it was being used, and I conclude that they recognized the amounts drawn upon it as firm liabilities. I am the more unable to reach any contrary conclusion because of the fact that the services for which these amounts were paid were of benefit to the other partners in their proportion quite as much as to Mr. Arbuckle. Flood, Kerr, and Edsall were working as employés of the firm, and it is conceded that their labors were well worth the amount paid them. I conclude, therefore, on this branch of the case, that the liability to Flood, Kerr, and Edsall was not a liability of John Arbuckle, but a liability of the firm, which would have so showed upon the books, had they been fully and accurately written up at the time of the dissolution agreement.

[3] There remains the second and more important question in the case, namely, whether it was or was not proper for the continuing partners to charge against Smith his proportionate share of this firm liability. The plaintiffs argue that the dissolution agreement, by its terms, expressly prohibited the charging of any firm liabilities against Smith, and also that the failure of the bookkeeper of the surviving partners to charge this amount in the first three statements rendered to him should prevent the defendants from being able later to make the correction. As to the dissolution agreement, the plaintiffs insist that it is unambiguous, and that the plain meaning of the words whereby the remaining partners agree to pay the debts and liabilities of the firm is that no such debts and liabilities, although existing on January 1, 1906, could be charged against Smith; that while it is true that the interest of a partner ordinarily consists of his share in the copartnership assets, less his share of the debts, the partners may, upon dissolution, vary this ordinary arrangement, and that they did so vary it by providing for the assumption of all debts by the continuing partners. I quote from the plaintiffs' brief, as follows: "Giving any meaning to the clause relating to the assumption and payment of debts, the agreement must be construed to mean that no debts of any kind or description were to be taken into account, nor was the amount of any debt to be deducted from the value of the assets in paying Smith his interest as called for by said agreement."

On the other hand, the defendants contend that, whether the dissolution agreement is interpreted alone or in connection with the articles of copartnership and the acts of the parties, it can only be construed to mean that Smith was to have his net interest in the business as of January 1, 1906; that the provision for the assumption and payment by the defendants of all the partnership debts and liabilities meant nothing but the usual arrangement made when a going concern is taken over by continuing partners, and did not affect the balancing of debts against assets in computing Smith's share; and that the fact that the charge was not made against Smith until the fourth statement rendered, meant simply that the figures had not yet been computed, and that as soon as they were computed they were properly charged.

For the purpose of clarifying this fundamental question in the case it will be well to set forth briefly the principal provisions of the dissolution agreement. That agreement, dated April 4, 1906, between Arbuckle and Jamison, of the first part, and Jarvie and Smith, of the second part, begins with a recital that the parties have been for upwards of 15 years copartners carrying on business under various names; that they have agreed to terminate their relations, and that Arbuckle and Jamison are to acquire all the assets and interests of Jarvie and Smith "in the assets and business of the said copartnership and to assume all debts and liabilities of the said copartnership upon the terms and conditions hereinafter stated."

It is accordingly provided, as follows:

First. Certain properties in Texas and elsewhere are to be disposed of within two years and the net proceeds distributed among the partners in proportion to their respective interests.

Second. All shares of stock and other securities shall be distributed in kind in the same proportion.

Third. All of the remaining assets are to be taken over by Arbuckle and Jamison as of January 1, 1906, at the inventoried value thereof on that date, including "generally all the property used or bought for the purposes of the copartnership." Then occur the words: "The said Arbuckle and Jamison agree to assume, pay, and discharge all debts, liabilities, and obligations of the copartnership and to assume all outstanding leases, agreements, and contracts of the said copartnership."

Fourth. After providing that Smith will retire on July 2, 1906, article fourth proceeds as follows: "The said Arbuckle and Jamison agree with the said Smith to pay to him, in money, the amount of the value of his share, in the copartnership property taken as of January 1, 1906, and also the sum of $898,208 in cash, for his interest in the business, trade-marks, and good will of the firm, and to represent the agreed amount of his share in the appreciation of the values of copartnership properties over the amounts shown by

the books. They also agree to pay the said Smith $89,820.80, and also interest from January 1, 1906, until July, 1906, at the rate of 6 per cent. per annum on his capital and 4 per cent. per annum on the surplus. Said last-mentioned amounts represent his interest in the six months' business for the year 1906, which is estimated on an annual basis of $1,600,000. Payments shall be made to said Smith as follows: On July 2, 1906, 25 per cent. of the whole amount. On January 1, 1907, 25 per cent., with interest on the same and on all deferred payments at the rate of 4½ per cent. from July 1, 1906. On July 1, 1907, 25 per cent., with interest on the same and on all deferred payments at the rate of 4½ per cent. from July 1, 1906. On January 1, 1908, 25 per cent., with interest on the same and on all deferred payments at the rate of 4½ per cent. from July 1, 1906."

Fifth. In determining the interest of Smith in the general assets as of January 1, 1906, the value of his interest in the properties mentioned in articles first and second shall, so far as they are represented in his account on the books of the firm, be deducted.

In order to prevail in this case it is incumbent upon the plaintiffs to show that this contract, not only varied the usual rule of law as to the liquidation of partnership properties, but also the same rule as it had been expressly confirmed in the articles of copartnership, which provided that, in the event of the withdrawal of a partner, the remaining partners should pay to him "his net interest in the business as of the date of his withdrawal, * * * taking stock for that purpose." It is unnecessary to inquire whether any extraneous circumstances can be looked to in interpreting the dissolution agreement. The reference to the articles of copartnership here made is not for such purpose, but simply to show that the burden is upon the plaintiffs to justify a most unusual method of liquidation. We have seen that the services of Flood, Kerr, and Edsall had been as valuable to the plaintiffs as to the defendants, and that the contract whereby those services were specially rewarded had been made for the partnership and was a partnership liability. We have also seen that if the books had been properly and accurately balanced on the 31st day of December, 1905, being the end of the last fiscal year before the dissolution agreement, they would have shown a balance in Smith's favor of $24,-320.44 less than they did show. It is undeniable that if there had been no agreement whatever the natural and proper course to have followed would have been to subtract from all the assets of the firm all of its liabilities and then to apportion the remainder among the parties according to their respective interests. I do not think it necessary to hold the agreement of dissolution ambiguous, nor to go into any outside evidence to ascertain from it what the meaning and intention of the parties was. On the contrary, the agreement seems to me sufficiently clear upon its face, and it also seems to me right, unless some decisive words can be found in it to vary the just and equitable apportionment of the assets and liabilities, that a construction of the agreement which is consonant with justice should be followed.

In reading, however, the agreement as written, I fail to discover language therein which would sustain the burden resting upon the plaintiffs of showing that it was the intention of the parties to vary the ordinary and legal method of distribution. On the contrary, I shall endeavor hereinafter to point out the natural construction to be placed upon the language employed, which, in the light of what the parties sought to accomplish, and as indicative of their intent, would sustain the view that, except with respect to certain specific factors in the liquidation adverted to, the ordinary rule in liquidation should prevail.

It is evident that if the remaining partners assumed the salaries of Flood, Kerr, and Edsall, and the amount of them were not subtracted, Smith would gain his proportionate share of the amount of these salaries in excess of "the amount of the value of his share in the copartnership property." A court will not go out of its way to strain the terms of an agreement to obtain such an unjust result. Needless to say, the parties here might have contracted for an unjust result if they had so wished, but I fail to find in the terms of the agreement itself that such was their intention. On the contrary, let us see what in a word was the arrangement made. The outside properties covered

by article first, and the securities covered by article second, were to be separately liquidated and distributed, instead of being taken over by the continuing partners, and to that extent were not to be included, as provided by article fifth, in determining the amount of the interest of Smith in the general properties. The general assets and the general liabilities, as provided in article third, were to be transferred from the old firm to the new firm. I do not take this to mean that all debts previously existing were to be left out of all account in liquidating the shares of the retiring partners, regardless of the fact that they were contracted for the benefit of the old firm, but simply that, as a matter of bookkeeping, January 1, 1906, was to be taken as the transition point, after which debtors should pay to the new firm and creditors should look to the new firm for payment.

Up to this point, therefore, I find nothing in the agreement to justify the plaintiffs' contention. The general partnership properties are then taken care of by article fourth, and there is provided in perfectly clear words that Smith is to be paid, "in money, the amount of the value of his share in the copartnership property taken as of January 1, 1906," namely, his share of the copartnership assets less the copartnership liabilities. He is also to be paid $898,208 for the agreed value of his share in the good will and intangibles and in the appreciation of values over the amounts carried on the books, together with the sum of $89,820.80, and interest on his capital and surplus, representing his share of the first six months' business of 1906 up to the date of his retirement. There is nothing in this article fourth which varies the meaning of what precedes. Smith is to get his net share in the partnershp as shown by the books on January 1, 1906, and it is only the increase of his share over the book values and the 1906 business for which arbitrary sums and methods of ascertainment are agreed upon. No method is provided by the agreement to ascertain "the amount of the value of his share in the copartnership property taken as of January 1, 1906," which means undoubtedly that this was left to the usual method of marshaling all of the assets and liabilities and striking a balance between them.

The case bears no resemblance to those in which partners have agreed upon a certain definite sum of money to represent the interest of one of them, after which the amount cannot be varied. There is nothing settled here in the way of a definite figure for the general properties, and all matters in respect thereof are still open to computation, and to offsetting liabilities against assets. An agreement to pay debts is not the same thing as an agreement to adopt a certain figure as a partner's credit balance without proper deduction for debts. The net result of plaintiffs' claim is that the word "property" in this article fourth is to be read as "assets," and that Smith is to get his proportion of all the assets of the firm, without regard to any of the liabilities whatever. To so construe the agreement would be not only to violate the principles of justice, but to twist the plain meaning of words.

[4, 5] By the agreement the partners, therefore, settled the four questions of how to deal with (1) the outside properties, not needed in the business; (2) the securities, not needed in the business; (3) the net value of the general assets and liabilities taken over by the new firm; and (4) the value of the intangibles, appreciated values, and six months' business of 1906. With these four questions settled, it would seem as if all possibility of doubt or dispute between the partners had been removed. All other questions would become mere matters of bookkeeping. The liquidation necessary to sever all business relations would necessarily take some considerable time, but the principles to which the partners had assented in advance would determine each question as it arose during the liquidation. The first step which would ordinarily be taken would be to write up the books, and the books when so written up would show tentatively the credit of each partner, both those remaining and those retiring. This was done, and Smith's credit balance on December 31, 1905, appeared to be $4,224,397.50.

This brings us to the precise controversy in this case. Assuming that I am right in holding that the salaries of Flood, Kerr, and Edsall stand on any different ties, Smith's credit balance, if the books had been properly written up, would not have been the figure just named, but $24,320.44 less, namely, $4,-

200,077.06. The plaintiffs are, in effect, contending that this bookkeeping error cannot be corrected. Of course, in making this contention, they are obliged to take the position that the right to correct the error had been taken away by the dissolution agreement. They say, in effect, that after the bookkeeper had written in a certain book a certain figure opposite Mr. Smith's name, no reduction of this figure could thereafter be made, because the partners not retiring guaranteed to Smith by the dissolution contract that this figure should be taken as the starting point for the adjustment of his interest as a retiring partner.

I see no virtue in this argument. The agreement did not fix Smith's interest with reference to the figures in the books, provided they were inaccurate. It is indisputable that if, in striking the balance on December 31, 1905, the bookkeeper had simply forgotten to make an entry, or had made a mathematical error, such omission or error could have been later corrected. I fail to see that the omission to include the salaries of Flood, Kerr, and Edsall stands on any different footing. Those salaries ought to have shown on the books and they ought to have appeared in the credit balance; it is explained that the reason why they did not so appear was that Mr. Arbuckle had not yet given to his bookkeeper the exact figures respecting them. When those figures were obtained there was no reason why they should not be charged. In this view it is quite immaterial that the first three statements rendered did not show them, since the liquidation was still open until the rendering and acceptance of the fourth and final statement, and no estoppel can be based upon an omission upon which Smith did not act and by which he was not in any way prejudiced. The plaintiffs claim that he was entitled to assume the correctness of the first statements. This is true only to the extent that he was entitled to assume that they were presumptively correct, errors and omissions excepted.

In one aspect the plaintiffs' claim might be regarded as a contention that the partnership agreement was equivalent to a bill of sale by which Smith and Jarvie agreed to sell, and Arbuckle and Jamison agreed to buy, all the interest of the retiring partners at certain prices, of which part were fixed and part were to be ascertained by reference to the books. The plaintiffs do not expressly advance this theory, and I refer to it simply to say that, if they had done so, I should still regard as controlling the arguments which I have presented.

I am sustained in the view that I take of this case by the fact that it coincides with the practical interpretation placed upon the dissolution agreement by the parties. Their action and conduct under that agreement show plainly that the construction for which the plaintiffs are now contending was not in the minds of any one of them when it was made. After the dissolution, and prior to January 1, 1908, when the fourth payment was made to Smith, various sums were received by Arbuckle and Jamison as continuing members of the firm upon accounts and claims which, prior to January 1, 1906, had been written off the books of the firm as worthless. Of these collections, Smith was credited with his proper proportion. On the other hand, various claims owned by the firm which had appeared upon the books as having some value were either reduced in amount or entirely written off as uncollectible, and the account of Smith as well as the accounts of the other members of the firm were thereupon charged with the amount of such reduction in their proper proportion. Why should Smith have received moneys collected on account of credits which had been written off, and why should be have acquiesced, without objection, in having amounts charged against him for credits later found to be worthless, if the parties had contracted with reference to a fixed sum in dollars and cents as represented by Smith's credit balance? Only in respect of the salaries of Flood, Kerr, and Edsall did Smith object to this method. As I have said before, I think it unnecessary to look to any extraneous facts in interpreting the dissolution agreement; but, were I to do so, I should of necessity be persuaded that the intention of the parties as shown by their subsequent acts was that Smith's share in the copartnership property should be taken to mean his real or net interest as it should appear in the light of the corrected and properly adjusted books.

My conclusion is that the amount of $24,320.44, for which suit is brought.

was Smith's proportion of a liability of the partnership, and as such was properly charged against him in computing his share under the dissolution. Judgment will therefore be directed, dismissing the complaint upon the merits, with costs.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, DOWLING, and HOTCHKISS, JJ.

Adrian H. Larkin, of New York City, for appellants.
William N. Dykman, of Brooklyn, for respondents.

PER CURIAM. Judgment affirmed, with costs, on opinion of the referee.

<hr/>

(93 Misc. Rep. 530)

## LEVENSON WRECKING CO. v. HILLEBRAND.

(Supreme Court, Appellate Term, First Department.  February 23, 1916.)

1. TROVER AND CONVERSION ⚖16—CONDEMNATION—PURCHASE OF BUILDING BY WRECKER—FIXTURES—REMOVAL BY TENANT.

The city of New York condemned premises held by defendant as a tenant and contracted with a wrecker to remove the buildings. The contract provided that all materials removed should become the property of the wrecker. After the condemnation proceedings defendant sold the contents of the building at auction, including its steam heating plant and a brass area railing. The wrecker brought this action in trover and conversion for the value of the heating plant and railing. *Held*, that the action would lie, since the plaintiff had an existing right to the immediate actual possession of the articles in question, at the time of the conversion.

[Ed. Note.—For other cases, see Trover and Conversion, Cent. Dig. §§ 119–147; Dec. Dig. ⚖16.]

2. FIXTURES ⚖15—HOTEL AND SALOON—HEATING PLANT—AREA RAILING— "TRADE FIXTURE."

The heating plant in a building used as a hotel and saloon, and a brass area railing on the premises, are not "trade fixtures."

[Ed. Note.—For other cases, see Fixtures, Cent. Dig. §§ 23–29; Dec. Dig. ⚖15.

For other definitions, see Words and Phrases, First and Second Series, Trade Fixture.]

3. FIXTURES ⚖33—NEW LEASE—WAIVER.

Where defendant lessee received an award in condemnation proceedings by the city in condemnation of the leased premises, and thereafter entered into a new lease with the city, without therein reserving the right to remove fixtures from the premises, the acceptance of such new lease was a waiver and abandonment by the defendant of the right to remove fixtures.

[Ed. Note.—For other cases, see Fixtures, Cent. Dig. §§ 64, 65; Dec. Dig. ⚖33.]

4. TROVER AND CONVERSION ⚖62—DAMAGES—EVIDENCE.

In an action of trover and conversion by a wrecking contractor to recover the value of steam heating plant and brass area railing removed from the building, which had been condemned by the city and sold by the tenant, a judgment for plaintiff for $475 *held* against the weight of the evidence, requiring a reduction to $280.

[Ed. Note.—For other cases, see Trover and Conversion, Dec. Dig. ⚖62.]

<hr/>

⚖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes